UNITED STATES *v.* E. E. HOLLER (No. 4252) [1]

United States Court of Customs and Patent Appeals, June 24, 1940

---

[1] C. A. D. 133.

*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector*, special attorney, of counsel) for the United States.

*Lawrence A. Harber* (*Abraham Gottfried* of counsel) for appellee.

[Oral argument February 5, 1940, by Mr. Spector and Mr. Gottfried]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

GARRETT, Presiding Judge delivered the opinion of the court:

This case is a companion of Appeal No. 4250, styled *United States* v. *E. E. Holler*, decided concurrently, 28 C. C. P. A. (Customs) 105, C. A. D. 132. Certain factual differences render separate decisions necessary.

In this case, as in that, the Government appealed from the judgment of the United States Customs Court, Third Division, one judge dissenting, sustaining protests filed to recover moneys paid as duties upon certain importations of fish brought into the United States from Mexico and entered at the port of Nogales, Ariz. Twenty-five protests are involved, the suits having been consolidated for trial.

The merchandise, which was imported on various dates ranging from November 6, 1936 to April 7, 1937, was classified by the collector and assessed with duty under paragraph 717 (a) of the Tariff Act of 1930. It was claimed by the importer to be free of duty under paragraph 1730 (a) of the act. These paragraphs are quoted in full in our decision in Suit 4250, together with paragraphs (c) and (d) of article 489 of the Customs Regulations of 1937, and need not be here repeated.

The same issues are raised with respect to the merchandise as those pressed in Suit 4250, and, in addition thereto, the record here shows the existence of certain facts not there present. In that case the fish were caught from a boat bearing the name of *Mabel*, which we found to be the property of one D. B. Almond (who carried on a business at Tucson, Ariz., under the name of Sonora Fish Co.), the actual importer in both cases, and which we held to have been shown to have United States documentation. In the instant case some of the fish were caught in the same way, but others were caught from canoes belonging to Mexican nationals, the canoes being rented and the fishermen in them being hired by the master of the vessel, L. C. Almond, an American citizen and a brother of D. B. Almond. It was stipulated that, so far as applicable, all the evidence taken in Suit 4250 should be treated as evidence in the instant case and the record there was incorporated here.

.The contention of the Government, in addition to the contention made there, is, in substance, that the fish caught from the canoes rented by Almond, they being canoes belonging to Mexicans who were members of an organization referred to as a "Cooperativa" and described in our decision in that case, were not products of American fisheries in the sense of the statute and regulations. It is

also contended that the fish so taken were commingled with the fish taken from the vessel *Mabel* itself, and that upon the record, the whole quantity imported is subject to duty by reason of section 508 of the Tariff Act of 1930 relating to the commingling of goods.

In addition to the testimony in the other case, that of L. C. Almond was taken on behalf of the importer in the instant case. In this he described his practice in employing Mexican fishermen to fish for him from their own canoes. In brief, he stated that the canoes used were about 18 feet long and of proportional width, not, so far as the record discloses, being of a type which required documentation; that ordinarily three men fished from one canoe, using hooks and lines; that when he desired to employ fishermen to fish in this way he would go to the office of the Cooperativa and inform someone there that he wanted so many canoes to fish for the load that, at the time, he was seeking to catch; that the person so informed would assign the canoes, or the men who owned the canoes, for the load he wished to take; that the owner of the canoe would select the fishermen (ordinarily two) whom he wished to accompany him; that sometimes he (Almond) would tow these canoes, or a part of them, out to the fishing grounds and sometimes they went out by themselves; that those fishing from the canoes "fished in close together" and near the *Mabel*; that after the catch they would sometimes, "but not very often," put the fish aboard the *Mabel*; that "quite often" he towed the loaded boats to the shore; but sometimes they went in alone; that after the fish were landed the fishermen "weighed them in to our truck driver"; that he (Almond) "paid the men in the office of the Cooperativa" for the fish caught in the canoes, that is, he paid the men that he "got the canoes from in the office," paying them so much per kilo "for the fish which the canoes caught" in a lump sum; that he did not designate how much went to each canoe, the record of that seemingly being kept in the office of the Cooperativa, or by the individual canoe owner; that after the fish had been dressed, weighed in, etc., the truck driver received a *factura* (which, we presume, was of the same character as that described in our decision in the other case) and "sent the fish away."

The trial court stated:

* * * The only difference in the former case is that payment for the services of the fishermen was made directly to them, the master deducting 1 centavo per kilo for Cooperativa dues, which he paid to the Cooperativa for the fishermen. Here payment for the services of the fishermen was made to a representative of the Cooperativa, who deducted the dues and then paid the owners of the canoes, who paid those who worked upon his boat and helped him clean his fish.

The trial court sustained the protests *in toto*, saying:

We fail to find any difference between fish caught by fishermen hired for the purpose to fish from the American vessel and fishermen who fished from their canoes at a wage measured by the weight of the fish taken by them.

In our view the additional facts in this case differentiate it from the other case, and we·are unable to agree with the conclusion of the trial court.

So far as the fish which were caught directly from the vessel *Mabel* are concerned, they obviously are in the same category as those involved in the other case, but certain facts later related herein must be considered with respect to them. It seems to us that those which were caught from the canoes and carried to the shore by the canoes are in a different category. Had the fish taken by those fishing from the canoes been carried to and placed upon the American vessel while it was at sea, we should have no hesitation in holding them to be a product of American fisheries, in view of the contractual relationship shown to have existed between the master of the vessel and the fishermen, and in view of various authorities. Where, however, the canoes went out under their own power and returned to shore, carrying their cargoes in the same manner, we think it would require a straining of the law so to hold. Under such a holding it would be possible for a small vessel to go into foreign. waters, employ a large number of foreign boats and fishermen, have the catch carried to foreign soil without being loaded upon, or in any way physically connected with, the American vessel, and still be admitted into the United States free of duty. We have found no case which would support such a holding and it is our view that such practice would not conform to the letter or the spirit of the law. So, as to those fish caught by the occupants of the canoes and carried to shore in the canoes, we must disagree with the trial court.

This holding necessitates consideration of other phases of the case which the trial court, under its view of the law, did not find it necessary to consider.

As has been recited, L. C. Almond testified that he sometimes towed the canoes hired by him out to the fishing grounds with the *Mabel*, and sometimes, but "not often" his vessel towed the boats with their cargo to shore, but there was no effort definitely to prove the towing with respect to such fish here involved as were caught from the canoes. So, it is not possible, upon the record, to segregate the catches which were placed upon the vessel and those in the canoes which were towed in by the vessel from those which were carried to shore in the canoes, moving under their own power, presumably that of propulsion by the men in them. The burden of showing this rested upon the importer and he has failed to make any showing upon which segregation in this respect can be predicated.

A further question arises, however, out of the fact that in each of the cases covered by the protests, it was shown that certain of the fish involved were caught from the *Mabel* itself just as in the other case, while others came from the canoes, and that all of them were loaded

into the truck together and imported in bulk without one class being segregated from the other class.

It is contended on behalf of importer than in any event the fish which were caught from the *Mabel* itself are free of duty, and that there is evidence of record upon which to base segregation. As has been indicated, we are of opinion that such fish normally would be entitled to free entry as a product of American fisheries, but the question of segregation is not free from difficulty.

In determining this it is necessary to consider what application, if any, section 508 of the Tariff Act of 1930 may have. The section reads as follows:

SEC. 508. COMMINGLING OF GOODS.

Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise can not be readily ascertained by the customs officers, the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof, unless the importer or consignee shall segregate such merchandise at his own risk and expense under customs supervision within ten days after entry thereof, in order that the quantity and value of each part or class thereof may be ascertained.

Section 508, or the substance of it, seems to have had its origin in the Tariff Act of 1922. Prior to that act we have found no provision in any law relating to the commingling of goods, but court decisions have been found bearing upon the matter. In the case of *United States* v. *Ranlett and Stone*, 172 U. S. 133, the Supreme Court of the United States held possible the segregation in bales of grain bags, those bags which were of United States manufacture, from those of foreign make. In the course of its decision it cited cases dealing with other types of merchandise held not to be segregable and distinguished the *Ranlett and Stone* case, *supra*, from those cases.

In the case of *Midland Linseed Products Co. et al.* v. *United States*, 10 Ct. Cust. Appls. 101, T. D. 38361, this court held certain screenings to be segregable for duty purposes from a mixture of linseed and screenings, affirming a judgment of the United States Customs Court. That case arose under the Tariff Act of 1913, which contained no provision relative to commingling of goods, and it appears that the mixture had been entered originally as linseed and assessed by the collector as such. The protest of the importers made the claim that the importation consisted in part of screenings segregable from the linseed and separately assessable with duty, and the courts sustained the protest in this regard.

The only cases which we have found that arose under acts containing a provision with respect to the commingling of goods are cases decided by the United States Customs Court and seemingly not appealed. Among this type of cases which we have examined are *W. A. Allen* v. *United States*, T. D. 48327, 69 Treas. Dec. 914,

*I. L. Radwaner Seed Co., Inc.* v. *United States,* T. D. 49036, 71 Treas. Dec. 976, and *Albers Bros. Milling Co.* v. *United States,* T. D. 49374, 73 Treas. Dec. 153. The first of these cases arose under the Tariff Act of 1922, and involved cotton seed and linters. It does not appear that segregation of the linters from the seed was made at the time of entry or within 10 days thereafter, but the court, upon the agreed stipulation of facts, and citing other decisions, held that the seed and linters were shown to be segregable by well-accredited tests; that the *onus* of separating did not rest upon the importer, and that section 507 (prototype of section 508, *supra*), was not applicable. Judgment was entered directing reliquidation, the seed to be assessed with duty and the linters admitted duty free. This case was cited and followed in Abstract Decision 36167, 71 Treas. Dec. 1153.

In the *I. L. Radwaner Seed Co., Inc.* case, *supra*, which also arose under the Tariff Act of 1922, pumpkin seeds were involved and in its decision the court quoted section 507, but held that there was no proof in the record as to the respective percentages of germinable and nongerminable seeds contained in the importations. Hence, it was held that there was no necessity of determining whether the importer would be entitled to segregation, and it did not pass upon the applicability of the section.

The *Albers Bros. Milling Co.* case, *supra*, arose under the Tariff Act of 1930. Kaoliang seed were there involved. It was found upon the record that 54 per centum of the seed was shown to have germinating qualities, and, hence, dutiable at 2 cents per pound under paragraph 763 of that act, while 46 per centum was found not to have germinating qualities and was held to be dutiable at 10 per centum ad valorem under paragraph 1558. In that case there was no reference to section 508, *supra*, and the matter of commingled goods was not referred to.

From a study of the foregoing decisions, both those rendered prior to any statutory provision respecting segregation of commingled goods and those subsequent thereto, we find that in each instance where the importer was granted relief it was definitely held, in effect, that the customs officers would have been able from the *per se* character of the merchandise, without extrinsic aid, to readily ascertain the quantity or value of the respective classes of commingled goods where such classes were subject to different duty treatments.

It is a reasonable assumption that Congress in enacting section 507 of the Tariff Act of 1922, predecessor of section 508 of the Tariff Act of 1930, *supra*, had in mind the decisions of the courts theretofore rendered upon the subject matter and desired to lay down a definite statutory rule to govern the procedure in cases of commingled goods. The principle of the decisions was embodied in the statute, and the section containing it is a general section which, in our opinion, governs

all paragraphs of the act wherever applicable. We regard it as applicable and controlling here.

The section is very clear. It obviously presupposes that where the customs officials are able readily to ascertain and segregate portions of imported commingled goods for duty purposes they will do so, and certain of the decisions above cited are to the effect that when there is a failure on their part to do this in cases where they might readily have made the ascertainment, the importer may make protest and present proof upon the subject matter at the trial. When, however, such officials are unable readily to determine the proper segregation the burden is placed upon the importer to "segregate such merchandise at his own risk and expense under customs supervision within ten days after entry thereof, in order that the quantity and value of each part or class thereof may be ascertained."

It is argued by counsel for appellee that in the instant case "the Collector did not assess duty on the merchandise as commingled goods under the authority of section 508, Tariff Act of 1930, and consequently the appellee had no burden of segregating the respective quantities of fish at the time of entry." Hence, he insists upon the right to present proof upon segregability at the time of trial.

Our attention has not been directed to any case in which a collector of customs in assessing duty upon commingled goods has specified section 508 as the authority for such assessment where the customs officials did not segregate the parts of the merchandise. In cases where they do not do so either upon their own volition or as the result of the importer's segregation, we can discern no reason for the collector citing the section. However that may be, the collector did not do so in the instant case for obvious reasons. First, he deemed the entire importation dutiable for the reasons which have been stated in the companion case (Appeal No. 4250). Second, the customs officials were unable "readily" to ascertain the segregable classes by an inspection of the merchandise. Obviously that was an impossibility. The only person, so far as the record shows, who could have supplied the information requisite for segregation was L. C. Almond, master of the *Mabel*, who kept the records. No tender of such information was made and the collector, had he been disposed to segregate the merchandise, had no basis for such action.

The importer made no effort to comply with the provision requiring him to segregate the different classes of fish. This was quite natural in view of the belief on his part that as a matter of law the entire importation was entitled to free entry, but he was not relieved of the burden because mistaken as to the law. The cases relied upon by counsel for appellee in support of his right to take proof at the time of the trial, notwithstanding the failure to comply with the statute at the time of importation or within 10 days thereafter, have been

sufficiently discussed above. Clearly the facts here distinguish this case from those.

For the reasons stated, the judgment of the United States Customs Court is *reversed.*

BLAND, Judge, concurring in the conclusion: On account of certain language used by the majority, I must concur only in the conclusion reached. I have stated my views in a dissenting opinion in *United States v. E. E. Holler*, Appeal No. 4250, handed down concurrently herewith. I concur in the conclusion reached for the reason that I agree with the majority upon its holding on the issue of commingling.